**In the United States Court of Appeals for the Eighth Circuit**

**DEIDRE PARKER,**

**Plaintiff-Appellant,**

**vs.**

**UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF AGRICULTURE; THOMAS J. VILSACK,**

**Defendant-Appellees**

**ON APPEAL FROM THE UNITED STATES DISRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI BEFORE THE HONORABLE FERNANDO J. GAITAN, JR., U.S. DISTRICT JUDGE**

**BRIEF OF APPELLANT**

Randles Mata, LLC
Rebecca M. Randles #40149
851 NW 45th Street, Suite 310
Kansas City, MO 64116
Phone: (816) 931-9901
FAX: (816) 931-0134
rebecca@randlesmatalaw.com
*Attorney for Appellant*

# I.    <u>SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT</u>

Deidre Parker appeals from the grant of summary judgment on her claims against the USDA for race and sex discrimination, retaliation and constructive discharge.

Ms. Parker's job duties were stripped away. She was constantly monitored. She was denied promotions for which she was highly qualified. She was given two "counselings." She suffered humiliation via her banishment from the Beacon Cafeteria for a period of 90 days (about 3 months). She was not allowed to detail areas commensurate with her grade level -- instead, she was assigned "busy work" and work below her grade-level.

These and other similar actions over the course of approximately four years were sufficiently severe and pervasive to form the basis of her discrimination, harassment and retaliation claims.

Parker adduced facts that create a *prima facie* case on each of her causes of action and the Court erred in granting summary judgment on her claims.


Plaintiff requests 15 minutes of oral argument.

## II.    **TABLE OF CONTENTS**

I.      Summary of Argument and Request for Jury ............................................. 2

II.     Tables of Contents .................................................................................... 3

III.    Table of Authorities .................................................................................. 5

IV.     Jurisdictional Statement ........................................................................... 6

V.      Statement of the Issues ............................................................................. 7

        a.  Standard of Review .......................................................................... 9

        b.  The Court Erred in Limiting the Scope of Plaintiff's Claims .............. 9

        c.  The Court Erred in Granting Summary Judgment on Plaintiff's Race and Sex
            Discrimination Claims .......................................................................... 9

        d.  The Court Erred in Granting Summary Judgment on Plaintiff's Hostile Work
            Environment/Harassment and Retaliatory Harassment Claims ......... 10

        e.  The Court Erred in Granting Summary Judgment on Plaintiff's Claims for
            Retaliation and Constructive Discharge ............................................. 10

VI.     Statement of the Case ............................................................................. 11

VII.    Summary of the Argument ...................................................................... 47

VIII.   Argument ................................................................................................ 48

IX.     Conclusion .............................................................................................. 74

X.    Certificate of Compliance ........................................................... 76

XI.   Certificate of Service ................................................................ 76

XII.  Addendum .................................................................................. 77

# III.  TABLE OF AUTHORITIES

## Cases

*Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 412 (6th Cir. 1999).....................58

*AMTRAK v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)......50

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)...............................................46

*Austin v. Minnesota Min. & Mfg. Co.,* 19 F.3d 1992 (8th Cir. 1999)............................10, 51

*B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1099 (9th Cir. 2002.) ....................................48

*Banks v. McIntosh Cty.,* 2022 U.S. Dist Lexis 23466 (2022 (GA S.D. 2022) .............10, 63

*Barnes v. Cessna Aircraft Co.*, 2011 U.S. Dist. LEXIS 147780 (Ks. D.C. 2011) .............59

*Barton v. Zimmer, Inc., 662 F.3d 448 (7th Cir. 2011)*.........................................................55

*Bassett v. City of Minneapolis,* 211 F.3d 1097, 1098 (8th Cir. 2000) .................................46

*Belgasem v. Water Pik Techs., Inc.,* 457 F.Supp.2d 1205 (Co. D.C. 2006).......................58

*Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986–87 (10th Cir. 1996) ................................59

*Carpenter v. Con-Way Cent. Express, Inc.,* 481 F.3d 611, 615 (8th Cir. 2007). ................65

*Cherry v. Menard, Inc.,* 101 F.supp.2d 1160, 1167 (N.D. Iowa 2000)...........................9, 45

*Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802 (Del. D.C. Nov. 12, 1986)....49

*Dixon v. Pulaski Cty. Special Sch. Dist.*, 578 F.3d 862, 868 (8th Cir. 2009).....................51

*Duda v. Bd. Of Educ. Of Franklin Park*, 133 F.3d 1054, 1059 (7th Cir. ..........................59

*EEOC v. Delight Wholesale Co.,* 973 F.2d 664 (8th Cir. 1992)....................................10, 48

*Ellis v. Houston*, 742 F.3d 307, 326 (8th Cir. 2014);.........................58

*Green v. Brennan*, 2017 U.S. Dist. LEXIS 148295 (D. Co. Sept. 13, 2017) ..............11. 67

*Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) .................59

*Hunt v. Cromartie,* 526 U.S. 541 (1999) ................................10, 45, 46

*Int'l Bhd of Teamsters v. United States,* 431 U.S 324, 367, 97 S.ct. 1843, 52 L.Ed.2d 396

(1977) ...................................................................10, 54

*Jackson v. Delta Special Sch. Dist.,* 86 F.3d 1261, 1266 (8th Cir. 1996)...........................64

Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997)................................11, 55, 57, 58, 64

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802– 804, 36 L.Ed. 2d 668, 93 S.Ct.

1817 (1983) ...................................................................50

*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49

(1986). ...................................................................10, 62

*Meritor Savings Bank, FSB v.  Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49

(1986). ...................................................................10

*Moylan v.MariesCounty,*7 92 F.2d 746, 749 (8th Cir. 1985) ................................63

*National Railroad Passenger Corp. v. Morgan,* 536 U.S.101, 114-15 , 122 S. Ct. 2016,

2073 (2002) ...................................................................10, 47

*Patrick v. Henderson*, 255 F.3d 914, 915-916 (8th Cir. 2001) ................................48

*Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000)................................45, 46

*Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998)...........................58

*Smith v. St. Louis University,* 109 F.3d 1261 (8th Cir. 1997). ......................................11, 64

*Sosa v. Hiroaka,* 920 F.2d 1451 (9th Cir. 1990) ........................................................10, 48

*Thompson v. Bi-State Dev. Agency,* 463 F.3d 821, 825 (8th Cir. 2006) ...........................65

*Walker v. City & Cty of Denver*, 2019 U.S.Dist. LEXIS................................................63

*Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)............................51

*Washington v. Cnty of Rockland,* 373 F.3d 319 (2nd Cir. 2004)....................................10, 63

*Weems v. Federated Mut. Ins. Co.*, 220 F.Supp.2d 979 (N.D. Ia. 2002) .....................48, 49

*Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir. 1998)........................................46

*Williams v. Waste Mgmt.*, 411 Fed.Appx. 226 (11th Cir. 2011)............................................53

### Statutes

28 U.S.C. § 1291 ...........................................................................................................9

28 U.S.C. § 1331 ...........................................................................................................9

### Rules

Fed. R. Civ.P. 56(c)......................................................................................................46

## IV. **JURISDICTIONAL STATEMENT**

**A.**     This case arises under Title VII, conferring federal question jurisdiction upon the lower court pursuant to 28 U.S.C. § 1331.

**B.**     This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**C.**     The Honorable Judge Gaitan, United States District Court for the Western District of Missouri, granted Defendant United States Department of Agriculture ["USDA"] Motion for Summary Judgment on August 29, 2023.  Deidre Parker filed her Notice of Appeal on Monday, October 30, 2023.

**D.**     This appeal is from a final order or judgment that disposes of all parties' claims.

## V.     STATEMENT OF THE ISSUES

### A.     Standard of Review

*De Novo* review is appropriate in this case as it comes before the Court following the Court following the grant of Summary Judgment pursuant to Defendant's Motion for Summary Judgment.

*Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000).

*Cherry v. Menard, Inc.,* 101 F.supp.2d 1160, 1167 (N.D. Iowa 2000).

*Hunt v. Cromartie,* 526 U.S. 541 (1999).

### B.     The Court Erred by Limiting the Scope of Plaintiff's Claims.

*National Railroad Passenger v. Morgan,* 536 U.S. 101, 122 S.Ct. 2016 (2002).

*EEOC v. Delight Wholesale Co.,* 973 F.2d 664 (8th Cir. 1992).

*Sosa v. Hiroaka,* 920 F.2d 1451 (9th Cir. 1990).

### C.     The Court Erred in Granting Summary Judgment on Plaintiff's Race and Sex Discrimination Claims.

*Austin v. Minnesota Min. & Mfg. Co.,* 19 F.3d 1992 (8th Cir. 1999).

*Dixon v. Pulaski County Special Sch. Dist.,* 193 F.3d 992 (8th Cir. 1999).

*Int'l Bhd of Teamsters v. United States,* 431 U.S 324, 367, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

### D.     The Court Erred in Granting Summary Judgment on Plaintiff's Hostile Work Environment / Harassment and Retaliatory Harassment Claims.

*Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

*Banks v. McIntosh Cty.,* 2022 U.S. Dist Lexis 23466 (2022 (GA S.D. 2022).

*Washington v. Cnty of Rockland,* 373 F.3d 319 (2nd Cir. 2004).

**E.      The Court Erred in granting Summary Judgment on Plaintiff's Claims for Retaliation and Constructive Discharge.**

*Smith v. St. Louis University,* 109 F.3d 1261 (8th Cir. 1997).

*Kim v. NashFinch,* 123 F.3d 1046 (N.D. IA 1991).

*Green v. Brennan,* 2017 U.S. Dist. LEXIS 148295 (Dist. Colo. Sept. 13, 2017).

## VI.    STATEMENT OF THE CASE

On March 6, 2011, Deidre Parker, an African American female, went to work for the USDA as a "Program Management Assistant." (App. 440 ; R. Doc. 49-1 at 5.)   Ms. Parker was hired by the RMA, a sub-agency of the USDA, and was assigned to work in the Actuarial and Product Design Division.  Ex. A, at 16 (8-11), 30(6-8).  During her tenure, the Actuarial and Product Design Division had approximately 28 employees. (App. 441; R. Doc. 49-1 at 6)  Risk Management Agency (RMA) is an Agency within the United States Department of Agriculture. (App. 1190-1193; R.Doc. 58-12). RMA has three divisions – Product Management, Insurance Services and Compliance.

Deidre was the only Program Management Assistant who is black.  (App. 814; R.Doc. 58-7 at 58).  Ms. Parker's first line supervisor was Ron Lundine, a white male. (App. 812; R.Doc. 58-7 at 56)  Ron Lundine was at all relevant times the Actuarial and Product Design Division Director, GS-15, RMA.  (App. 894; R.Doc. 58-7.)  Lundine's first line supervisor (Parker's second line supervisor) was Rodger Matthews, Associate Deputy Administrator for Project Management. (App. 925; R.Doc.58-7 at 169)  Matthews is African American.  Tim Witt was Rodger Matthews first line supervisor until he retired in 2016.  He was named as a discriminating official in Plaintiff's EEO complaint.  (App. 812; R.Doc. 58-7 at 56).

The USDA and its sub-agencies, RMA and FSA, share space at the Beacon Building located at 6501 Beacon Drive, Kansas City, MO. 64133. (App. 1087: R.Doc.58-6 at 3).

John Underwood is an employee of the U.S. Department of Agriculture. At the time that he gave his affidavit in this matter, he was Deputy Administrator for Management, Management Services Division, Farm Service Agency, USDA. (App. 951; R.Doc.58-7 at 195) As a Support Services Supervisor, he was the Designated Official for the Beacon Facility. (App. 952; R.Doc.58-7 at 196) As the Designated Official, he was responsible for issues that arose in the facility; he was contacted by USDA employees and contractors in the facility. (App. 952; R.Doc. 58-7 at 196)

Whenever an issue arose concerning the facility, the management of the sub-agencies had to work together to resolve the issues. They shared all the common areas, including the hallways, the cafeteria, the parking lot and conference rooms. (App. 1087; R.Doc.58-8 at 3)

After Rodger Matthews retired from RMA, Underwood was promoted and moved to RMA Associate Deputy Administrator for Project Management. (App. 655; R.Doc. 58 at 655). The management for USDA / RMA / FSA and FPAC get the same management training from the USDA. They have been moved around interchangeably among the agencies and frequently communicate with, train with and act in concert with each other. (App. 1087: R.Doc.58-6 at 3).

### A. Plaintiff's Job Duties

Plaintiff's position description introduction explains that she was to act as a confidential personal assistant to the Division Director of the Actuarial and Product Design (APDD) Division in Project Management and other professional staff, "coordinating a wide variety of administrative and clerical tasks essential to the program administration of the APDD". (App. 1008-1012; R.Doc. 58-7 at 252). Plaintiff's Position Description is five pages long. It describes her role in the APDD. (App. 1008-1012; R.Doc. 58-7 at 252). It involved more than the maintenance of files or clerical duties. Her duties included, without limitation the following:

participating in program planning support work such as project monitoring and coordination, travel documentation, budget coordination /tracking, agreements and purchasing / procurement of supplies and equipment, and human resources administration;

• providing training and advisory services to the Division Director, Branch Chiefs and professional staff in program administrative procedures ensuring compliance with regulations;

• participating in the annual resource management efforts by assisting in developing and executing the annual budget which could include developing financial

plans, monitoring spending, preparing financial reports, tracking, and providing information on costs.

- Compiling data / salaries / expenses / personnel changes / equipment / R&D needs based on previous year expenditures; prepares and ensures the accuracy of reports;

- Serves as the primary administrative business process point of contact for the division;

- Advises on procedural and documentation requirements for the current projects, work plans, annual progress reports, research proposals, travel proposals and follow-up trip reports and cooperative agreements, grants, etc.

- Coordinates recorded documentation reporting retention requirements and provides oversight for the process; maintains a product documentation manual; notifies staff of the due dates and notifies project leader or supervisor when due dates are missed.

- Coordinates the peer review process and electronically submit documents via automated document retention system.

- Based on knowledge of the subject matter, assembles information from a variety of sources for meetings, conferences, etc.

- Uses and electronic calendar, database or spreadsheet software to document employee leave schedules and to commit the Division Director's time for appointments and meetings, transmits and receives documents and messages electronically;

- Performs tasks using on-line systems;

- Uses a variety of graphical, spreadsheet and database software packages to obtain data from published reports and manipulate data to produce tables and charts for program management and administrative use. Prepares graphics, photos / slides and creates tables and graphics based on statistical data for Division Director, Branch Chiefs and professional staff for use in presentations at meetings, workshops and conferences.

- Produces a wide range of documents using a variety of office automation technologies.

- Develops and implements new systems or administrative processes to meet Division needs.

- Prepares travel requests and vouchers. Advises on travel allownances and requirements and ensures adherence to travel regulations.

- Screens all calls and visitors.

- Receives and reads all incoming correspondence directed to the Division and initiates actions necessary for its proper disposition.

- Receives and reads all incoming correspondence directed to the Division and initiates actions necessary for its proper disposition.

- Schedules conferences and meetings including arranging logistics;

- Serves as principal timekeeper to the location, which includes preparing, maintaining and transmitting Time and Attendance (T&A) reports;

- Train back-up timekeeper to serve during her absence; prepare and submit leave audits and provide technical pay and leave advice on routine matters;

- Establish, maintain and revise the office filing system;

- Completes requests for personnel actions and writes and / or provides sample position descriptions; distributes forms and instructions for annual performance ratings and ensures timely and proper completion;

- Coordinates the submission of routine periodic reports / write ups for mandatory cyclic reviews; advises staff of current requirements and schedules;

- Serve on special committees or special projects in either a lead or supporting role. (App. 1008-1012; R.Doc. 58-7 at 252).

In addition, to these duties (and more as found in the PD), Plaintiff was also responsible for knowing and supporting equal opportunity and civil rights policies, assuring bias free written and oral communication and, as appropriate, preparing for career advancement opportunities. (App. 1008-1012; R.Doc. 58-7 at 252).

## B. Working Conditions at USDA/RMA

The working environment at the USDA Beacon Complex in Kansas City has for decades been very discriminatory. (App. 1086-1089; R.Doc.58-8). Racial slurs are not uncommon. One employee has been subjected to humiliating racial comments, including beaner and spic; he has been asked if he knew whether his children were actually his.

The NTEU Vice President, who is African American, was introduced to out-of-town managers as "our Union boy."  When management and employees in his division were together, coments were made such as "who brought the wet back" and "we'd better check his green card."  (App. 1086-1089; R.Doc.58-8).  This kind of behavior is common for management in the USDA Beacon facility.  (App. 1086-1089; R.Doc.58-8).

Multiple emails were sent around which referred to African Americans as the N word.  One email "joke" said that the one way to starve out an Obama supporter is by placing their food stamps under their work shoes.  (App. 1195 – 1213; R.Doc. 58-13).  Another stated that the term "N ----- Rigged" will be replaced with "Presidential Solution."  Many other similar emails made the rounds through the USDA Beacon facility.  (App. 1195 –1213; R.Doc. 58-13).

There was a "good old boys" network at the USDA / RMA.  Those who have the approval of the "good old boys" receive highly visible work assignments that allow them to them to move up; those that do not, are not given those opportunities.  (App. 1086-1089; R.Doc.58-8).

Rios, a Union Steward, has seen the highly visible assignments given to Caucasians over people of color on numerous occasions.  (App. 1086-1089; R.Doc.58-8).  The USDA is rife with negative racial stereotyping.  Black women have been portrayed as "angry black women" and Deidre Parker was similarly portrayed.  (App. 1086-1089; R.Doc.58-8).  People with brown skin – African Americas, Hispanics, East Indian

employees with brown skin. They were placed in positions where they train others, but they ae not chosen for the higher positions for which they train the Caucasians. Those positions got to Caucasians, even if the East Indians have more experience or training. None of them have been promoted. Because of their cultural traditions, they do not complain or make EEO complaints. (App. 1086-1089; R.Doc.58-8).

Rios himself experienced discrimination when his second line supervisor's administrative assistant told him to withdraw his EEO complaint because it would ruin his career. She told Rios that he would be miserable from all of the retaliation. (App. 1086-1089; R.Doc.58-8). Rios' second line supervisor made comments that Rios was a beaner, wetback, and asked whether he knew if his children were really his and other racial comments. (App. 1086-1089; R.Doc.58-8).

### C. Parker's Employment Discrimination Claims

Deidre Parker filed an employment discrimination claim in 2013 over her performance appraisal. Rodger Matthews lowered her appraisal from "Outstanding" to "Fully Successful" without justification. (App. 745-753; R.Doc. 58-5) All of Plaintiff's supervisors including Ron Lundine and Rodger Matthews knew of the 2013 complaint. (App. 817; R.Doc. 58-7). Plaintiff's complaint settled in her favor with her "Outstanding" review being restored and other considerations. (App. 840; R.Doc.58-7 at 84).

### *D. Claims Found in RMA 2016-00794*

Ms. Parker claimed she faced an ongoing and oppressive series of discriminatory actions and retaliatory conduct during her employment with the USDA. (App. 784-789). Plaintiff came to her position while completing a college degree at University of Missouri – Kansas City. She completed that degree in 2013. (App. 784-789; R.Doc. 58-7).

Ms. Parker had over 25 yeas of federal service with various agencies at the time she was hired at the USDA / RMA. (App. 784-789; R.Doc. 58-7). Complainant was in her position for nearly six years before filing this EEO complaint. (App. 784-789; R.Doc. 58-7). Other Caucasian employees with less experience and education have been offered detail assignments and promotions while she remained in the same position as when she started. (App. 784-789; R.Doc. 58-7). . She had little to no daily assignments. (App. 784-789; R.Doc. 58-7). Caucasian employees were given opportunities and promotions that she was denied. (App. 784-789; R.Doc. 58-7).

Deidre continuously requested special assignments, shadowing, to work on details or reassignment, applied for promotions and requested to be moved out of product management. (App. 784-789; R.Doc. 58-7). Complainant even asked about creating a position that would allow her to grow in the Agency but has been told that her degree "does not apply to any job in RMA." (App. 784-789; R.Doc. 58-7).

Ms. Paker has been retaliated against based on her prior complaint that she filed and won regarding discriminatory treatment. (App. 784-789; R.Doc. 58-7). Plaintiff has

suffered a hostile work environment based on her race, age, sex and retaliation. (App. 784-789; R.Doc. 58-7).

Plaintiff received a 90 day ban from the Beacon Cafe and a letter of reprimand unfairly and discriminatorily. (App. 784-789; R.Doc. 58-7). The Agency failed to investigate any of the allegations prior to disciplining Plaintiff. (App. 784-789; R.Doc. 58-7). The Agency used the Beacon Cafe incident as a straw man to retaliate against Plaintiff.

### d. Complaints found in 2nd EEO RMA 2018-00965

In the acceptance letter dated February 8, 2019, the following issues were accepted for investigation: Whether the complainant was subjected to discrimination and harassment (nonsexual) based on race (black), color (light skin), sex (Female) age (DOB 4/14/60), physical disability (Cardiac condition) and reprisal (prior EEO activity), when:

1). On or about September 10, 2018, she was forced to retire.

2). On September 4, 2018, she learned managment subjected her to a misconduct investigation;

3). On August 24, 2018, management issued her a Letter of Counseling and;

4). On several dates, she was subjected to various incidents of harassment including, but not limited to:

A). From August 8 to September 4, 2018 her immediate supervisor scolded her, ignored her during working hours, accused her of disparaging and threatening other employees; and

B). On September 10, 2018, management ordered her to be escorted out of the building. (Ex. 23, 2018 ROI Bates No. 000002-000003].

### E. Retaliation

Plaintiff's first EEO case against RMA was filed in 2013. In that case, she named Rodger Matthews as the discriminating official as he unilaterally changed her Outstanding review to Meet Expectations. (App. 812; R.Doc. 58-7 at 56) That complaint settled on May 29, 2015. (App. 553-556; R.Doc. 49-7).

Right after that settlement, in the middle of 2015, Ms. Parker's work dried up. She had previously been included in management meetings within the division so she could be kept abreast of any activities regarding her administrative responsibilities. After the resolution of her EEO complaint, she was no longer included in those management meetings. From June 2015, Plaintiff had no consistent work. (App. 814; R.Doc.58-7 at 58). Plaintiff was having to go from place to place to ask for work. She took it upon herself to clean out the old file cabinets in her division. (App. 814; R.Doc.58-7 at 58) When she queried Lundine for work, he told her that Kristen Chow had need of help with scanning. When Plaintiff approached Kristen Chow, she was told that she was not needed. (App. 819; R.Doc. 58-7 at 63).

Ron Lundine and Plaintiff had conversations so he knew that Plaintiff did not have much work, if any, on a daily basis. He asked the branch chiefs to assign Plaintiff work but it was very minimal. (App. 819; R.Doc. 58-7 at 63). Plaintiff had nothing to do on a regular basis and she was not given any of her essential duties that appeared in her job description. (App. 819; R.Doc. 58-7 at 63).

On or about July 5, 2016, Ron Lundine told Plaintiff that John Underwood told Rodger Matthews that they had a 60 day detail position at the warehouse for her. Plaintiff understood that the detail would be at a Grade level 6, moving boxes in the warehouse. (App. 755-756; R.Doc.58-6).

As Ms. Parker had a heart condition, moving and lifting boxes for long periods of time would have been hard for her. As a result, she declined the position. (App. 884-886; R.Doc.58-7 at 128-130). Now, the Agency states that the position would have been in an air- conditioned area in the mail room however, that was never conveyed to Plaintiff at the time. (App. 755-756; R.Doc.58-6).

Ms. Parker felt degraded being asked to detail to a lower position than the one she held as she had a college degree; she had received outstanding reviews in her position as described in the position description; the Caucasian women who held the same position as her had all been promoted to higher grade positions; and she had been seeking a position, detail and special projects that would allow her to move up in the Agency. (App. 819; R.Doc.58-7 at 63; App. 850-851; R.Doc. 58-7 at 94-95).

During his tenure at the USDA / FSA and FPAC / BC, Rios observed Ms. Parker was a target of discrimination. He observed Ms. Parker not being assigned work. Over time, he observed this wearing on her as her demeanor became down and sad. Having himself experienced this, he knew that there is trauma in a hostile environment. (App. 1086-1089; R.Doc. 58-8). Rios saw that others were given the opportunity to advance through training, details and special projects. Deidre was not given those opportunities. (App. 1086-1089; R.Doc. 58-8) Without the special projects, training and details, it would be very difficult if not impossible for Ms.

Parker to qualify and advance to new opportunities. (App. 1086-1089; R.Doc. 58-8)  Ms. Parker consistently sought work, asked for details to other divisions, asked to job shadow and to receive training that would further her career. (App. 814; R.Doc. 58-7 at 58).  After her complaint, Ms. Parker was given no job duties, has not been allowed to detail to appropriate positions, get training, move to a promotion  potential position but was instead given "busy work" that was beneath her skill set, education and grade level. (App. 817; R.Doc. 58-7 at 61).

Ms. Parker was approached by several individuals who offered to let her job shadow and sought her out for work details, but she was denied the opportunities by Rodger Matthews.  (App. 820; R.Doc.58-7 at 54).

Maureen Ferentz, Contracting Officer, was reassigned to APDD.  She is the Agency's only Contracting Officer. Plaintiff asked if she could shadow  her but was told

there was no money for shadowing. That response was pretext as there is no cost to the Agency for shadowing. (App. 820; R.Doc.58-7 at 64).

In November 2015, Plaintiff was offered a detail in the Human Resources Division (HRD) for 60 days. However, it required RMA to pay the Farm Services Agency for her salary and they refused to do it. (App. 821; R.Doc.58-7 at 65). In January 2016, Ms. Parker asked Felicia Harper, Supervisor, Classification if she would be interested in taking Plaintiff on a detail in her branch. After speaking to Rodger Matthews, she no longer had anything to offer after having been interested. (App. 821; R.Doc.58-7 at 65).

Ms. Parker was allowed one detail to Human Resources in FSA. During her 60 day detail, she would have been rated Fully Successful or Superior. (App. 823; R.Doc. 58-7 at 67). Deidre also applied for Leadership Programs and trainings that would have made her more promotable. All of those were denied. (App. 842-882, R.Doc. 58-7 at 86-126).

The dates of the detail denials are as follows:

9/18/14 Approached by Maureen Ferentz about shadowing her so Plaintiff could help out when Ferentz was gone. (App. 839; R.Doc.58-7 at 83) 2/2/17 Met with Alvin Gilmore, Central Regional Compliance Office, about

90 day detail. It was denied. (App. 839; R.Doc. 58-7 at 83).

03/04/16 Met with Jeana Nolan for reassignment but was denied because Plaintiff was a GS-7.  She has been a GS7 because she has never been promoted, trained or given promotio opportunities.  (App. 839; R.Doc. 58-7 at 83).

01/20/16  Requested Matthews to extend detail to FSA, Acquisition Management Division.  Nothing happened. (App. 830; R.Doc. 58-7 at 83).

08/10/16  Suggested that a liaison position be created between Risk Management and Farm Service Agency.  They created that position and then filled it with someone else.  (App. 830 –852; R.Doc. 58-7 at 83-96).

On 1/20/16, she sought the detail to continue in HRD but was told that it could not be extended.  (App. 816-852; R.Doc. 58-7 at 54-96)

On 07/06/16 In July 2016, Ms. Parker was offered a detail to a lower position in a warehouse moving boxes.  She turned it down and asked to be placed in a position that better fit her education, physical limitation and experience.  (App. 839; R.Doc. 58-7 at 83).

## F.  Promotion Denial

Black women are underrepresented in the USDA at higher levels and the USDA is rife with racial stereotyping.  Black women have been portrayed as "angry" and Deidre Parker was similarly portrayed.  (App. 1086-1089; R.Doc. 58-8) People with brown skin – African Americans, Hispanics, East Indians – are typically not promoted. (App. 1086-1089; R.Doc. 58-8)  Even in situations where the brown skinned employee trains the

Caucasian, the higher positions go to the Caucasians. (App. 1086-1089; R.Doc. 58-8)

Brooks concurs with Rios. She explains that before Complainant came to the Agency,

there was a Hispanic lady in her same administrative position, who was a Grade 6, Step

10. When all the white secretaries were promoted to higher grades (GS-7s), she was not

equally promoted. (App. 1256; R.Doc. 58-17 at 4)  At the time that Plaintiff was hired,

there were three white ladies who got promoted to a GS-9 while Parker stayed at a GS-7.

(App. 1256; R.Doc. 58-17 at 4).

When Plaintiff first got the position as a Management Support Assistant, there were

two other administrative support staff. Plaintiff was the only black.

(App. 855; R.Doc. 58-7 at 99).  One of the white women relocated to Montana as a

Risk Management Specialist, which left Plaintiff and one other Caucasian female,

Charlene Madsen. (App. 855; R.Doc. 58-7 at 99)  The white administrative support staff

were allowed to rotate working in the Front Office (Product Management

Office). Plaintiff was not allowed to participate in any activities in the front office

other than during the holidays or answering the phones from her desk in APDD.

(App. 855; R.Doc. 58-7 at 99).

Charlene Madsen, a Caucasian female, was allowed to work two divisions—

PAAD and PASD.(App. 855; R.Doc. 58-7 at 99).  When Plaintiff got her position, she

was told that each Management Support Assistant would rotate through the front office, a

higher profile position. (App. 855; R.Doc. 58-7 at 99). Plaintiff was not rotated through the front office from 2012 until she left the agency. App. 855; R.Doc. 58-7 at 99).

In approximately August 2015, a management analyst position became open in RMA/PM at the GS-9 level. Plaintiff immediately inquired about it and asked if she was retiring or leaving the agency. When she indicated she was not, Plaintiff knew that the position had been created for Charlene Madsen. App. 855; R.Doc. 58-7 at 99) She did not apply as Charlene had been groomed for the position through the extra assignments she had been given. App. 855; R.Doc. 58-7 at 99).

The white females do not have college degrees but management has assisted them in being productive and valued employees, while Plaintiff, a college graduate, was not. She ended up sitting day in and day out with nothing to do. (App. 838; R.Doc. 58-7 at 82). Debra Lackey, Teresa Ballard, Charlene Madsen, and Marni Walter all are Caucasian, have been given opportunities to train and work higher profile jobs like the front office and have been subsequently promoted. Plaintiff is the only one with a college degree but also the only one who has not been promoted and who no longer had any job duties. (App. 817; R.Doc. 58-7 at 61).

Plaintiff applied for the following positions within the USDA for which she was not promoted:

> 8/19/2016, Risk Management Specialist, GS1101-9. (App. 1229-1252;
>
> R.Doc. 58-16)

Contract Specialist Position; received a recruit status of Best Qualified but was not selected. (Ex. 16, USDA Application Summary (App. 1229-1252; R.Doc. 58-16)

Human Resources Specialist; Best Qualified; did not receive that position. (App. 1229-1252; R.Doc. 58-16)

There were other positions Plaintiff qualified for, but she does not have the paperwork for them.

## G. Beacon Café

On May 6, 2016, Plaintiff went to the Beacon Café at the USDA for a breakfast sandwich. When she received the sandwich, it was not done. She showed the sandwich to an Anitra Young. (App. 1178-1181; R.Doc. 58-10)  Ms. Young testified that the sandwich was horrible. Prepared by Calvin Moses, the not done and the egg was not cooked. (App. 1178-1181; R.Doc. 58-10).

Deidre asked that the sandwich be remade. (App. 1178-1181; R.Doc. 58-10). Ms. Young saw the interaction. She reports that Ms. Parker was very polite when she approached Calvin Moses to remake the sandwich. (App. 1178-1181; R.Doc. 58-10) Calvin Moses was immediately mean and nasty and refused to make the sandwich for her. (App. 1178-1181; R.Doc. 58-10)   Instead, Moses smashed the sandwich with his hands

and threw it in the trash. He refused to make the sandwich so Matt, the cafeteria local manager, made the sandwich for Ms. Parker. (App. 1178-1181; R.Doc. 58-10)

Moses was known as an employee who stirred up trouble. According to his co-worker, Anitra Young, Moses had no people skills and was always trying to get someone in trouble. or report them to Tiffany. He was very dramatic and gossiped about others regularly. (App. 1178-1181; R.Doc. 58-10)

Deidre Parker made a report to the facility on May 6, 2016 about the incident. (App. 1001; R.Doc. 58-7 at 245). After that incident, Ms. Parker continued to go to the café. She was observed to always be pleasant and polite. (App. 1178-1181; R.Doc. 58-10) Except for the sandwich incident, she was never seen to give any of the employees any problem. (App. 1178-1181; R.Doc. 58-10).

On May 18, 2016, the cafeteria closed at 6:20 a.m. when the cook left the Beacon Building and the other cafeteria staff closed down the cafeteria, leaving no onsite food for the lunch band. (App. 1090 – 1176; R.Doc. 58-9). John Underwood and John Sianez were notified of the closure, contacted the GSA about it and tried to arrange for food trucks to serve the employees during the lunch band but were unsuccessful because of the food trucks previous commitments. (App. 1124; R.Doc. 58-9 at 35). They did arrange for food trucks for the remainder of the week. (App. 1124; R.Doc. 58-9 at 35). Thereafter, they scheduled a meeting with GSA (the government agency responsible for managing leases) regarding Beacon Café . (App. 1125; R.Doc. 58-9 at 36). Two days

later, on May 20, 2016, a meeting with FSA was confirmed to discuss the cafeteria walkout. ((App. 1123; R.Doc. 58-9 at 33). That same day, Tiffany Buettgenbach, the area supervisor for the contractor providing cafeteria services, sent an email to John Sianez accusing Deidre of complaining about the size of her omelet, hanging around the cafeteria too long, disturbing the employees and stealing. (App. 1123; R.Doc. 58-9 at 34). Ms.

Buettgenbach also told John Sianez that an employee who was Deidre's friend was giving her free merchandise. (App. 1123; R.Doc. 58-9 at 34). This information was shared with Rodger Matthews, John Underwood, Ron Lundine, and others through a series of emails and telephone conversations. (App. 1123; R.Doc. 58-9 at 34).

In emails between Underwood, John Sianez, Robert Haughton, Rodger Matthews, Jay Van Der Werff, Noreen Joice, Charlene White, Charles Schwartz, Gregory Burnette, and possibly others, Underwood requested a report from the Federal Protective Service, Department of Homeland Security regarding whether Deidre stole from the cafeteria. (App. 1121-22; R.Doc. 58-9 at 31-32).

The Federal Protective Service declined to take action on the basis that the actions described did not constitute theft. (App. 1122; R.Doc. 58-9 at 32) No one interviewed Deidre Parker or told her about the slanderous remarks by Buettgenbach. (App. 828;

R.Doc. 58-7 at 72). Nonetheless, John Underwood told Demetrius Rios that Deidre Parker could not be trusted and that she was stealing from the cafeteria with the help of a cafeteria employee. (App. 1086-1089; R.Doc. 58-8).

Demetrius Rios, a union steward at FSA, told Underwood that he needed to talk to the RMA union about the incident. All union members have a right to defend themselves against these kinds of reports and to have the union involved. (App. 1086-1089; R.Doc. 58-8).

To Rios' knowledge, no investigation had been conducted at that time.

Management seemed to be taking the supervisor's word that Ms. Parker was a thief. (App. 1086-1089; R.Doc. 58-8). Rios was suspect of the charge as the employee who was allegedly in on the stealing continued working in the cafeteria. (App. 1086-1089; R.Doc. 58-8).

Roger Matthews contacted Thomas Worth, John Sianez, John Underwood, Robert Haughton, Jay Van Der Werff, Noreen Joice, Charlene White, and possibly others, and told them that Ron Lundine would issue a counseling to Deidre Parker for her behavior. (App. 1103-1177; R.Doc. 58-9). Thereafter, on May 20, 2018, without conducting any investigation, Ron Lundine issued a verbal counseling to Deidre Parker telling her not argue with the cafeteria staff or spend more time than allowed in the cafeteria. (App. 813; R.Doc. 58-7 at 57; App. 895 R.Doc. 58-7 at 139). Lundine was Plaintiff's first line supervisor and he had never counseled, disciplined, or reprimanded Plaintiff for the time

she spent in the cafeteria. (App. 125; R.Doc. 58-17). Anitra Young, an employee of the cafeteria, noted that many employees spent too much time in the cafeteria, some even hiding behind posts so as not to be seen. Deidre Parker did not spend an inappropriate amount of time in the cafeteria. (App. 1178-1180; R.Doc. 58-10). Underwood, Sianez, and Matthews knew that Tiffany Buettgenbach made accusations against employees whenever there was a report made against her or her staff. (App. 1104-1177; R.Doc. 58-9).

On June 1, 2016, Buettgenbach made similar reports that Dave Mendez was stealing from the cafeteria. (App. 1104-1177; R.Doc. 58-9). On that date, she reportedly called John Sianez and told him she was tired of thievery from USDA and that she observed David Mendez taking condiments left behind from the FEB training. (App. 1104-1177; R.Doc. 58-9).

Sianez explained that Mendez was cleaning the room but, according to Sianez, she could not be mollified and told Sianez "she saw what she saw" and she was going to file a report "since the USDA was so quick to file reports against her." (App. 1104-1177; R.Doc. 58-9). Sianez contacted Mendez to get his side of the story and learned that Mendez was cleaning the room for the next day's training. ((App. 1104-1177; R.Doc. 589). Sianez requested stern language from Underwood to Buettgenbach as Sianez knew that Buettgenbach would retaliate against USDA for actions or behaviors by her staff. (App. 1104-1177; R.Doc. 58-9).

Sianez also requested permission to begin the removal process for Tiffany

Buettgenbach, indicating that she is unhappy with her employer and taking it out

on

USDA employees. (App. 1104-1177; R.Doc. 58-9). Underwood sent an email to

Larry Hisle regarding the FED arrangement with the Beacon Café on June 2, 2016 and

reported that the Agency was having difficulties with the manager of the Beacon Café and

that the thievery allegation against Mendez was "another attempt at 'payback' for the

actions that we (FSA and MSD) had to take." (App. 1104-1177; R.Doc. 58-9).

Thereafter, on June 21, Tiffany began charging for condiments, sugar, butter, creamer,

and even silverware.

(App. 1104-1177; R.Doc. 58-9).

Issues with the cafeteria continued for USDA/FSA/RMA including failure to

appropriately remove grease, employees not wearing gloves to prepare food (App. 1104-

1177; R.Doc. 58-9). Concerns about broken glass in the food (App. 1104-1177;

R.Doc. 58-9) and others.

On June 27, 2018, Deidre Parker complained. She explained that while normally

she ordered food from the grill, for some time she had avoided ordering from the grill

because Calvin Moses would not prepare or serve food to her. On that date, he asked an

employee to serve Deidre when that employee was trying to leave for the day. (App.

1104-1177; R.Doc. 58-9).

Underwood agreed to talk to the manager of the Beacon Café. (App. 1104-1177; R.Doc. 58-9). Within a week of that report, Ron Lundine reportedly received an email indicating that Deidre Parker was still engaging in the types of activity for which she had been counseled in May, 2016. (App. 895; R.Doc. 58-7 at 139). On July 11, 2016,

Plaintiff received a letter from Tiffany Buettgenbach, Area Supervisor, Rehabilitation

Services for the Blind, which states, "Due to a continuing pattern of disruptive / disrespectful behavior towards staff . . . Beacon Café will temporarily refuse service to Ms. Parker for a period of 90 calendar days beginning July 18, 2016." (App. 813; R.Doc. 58-7 at 57).

The letter had originally been emailed to John Underwood and John Sianez, Farm Service Agency, who forwarded it to Rodger Matthews and Ron Lundine. Based on the unfounded, uninvestigated and untrue allegations in the letter, Plaintiff was issued a letter of counseling. (App. 813; R.Doc. 58-7 at 57).

### H. *Letter of Counseling*

On July 11, 2016, Ron Lundine, Plaintiff's supervisor, issued a Letter of Counseling regarding Deidre's behavior at the Beacon Café. (App. 895; R.Doc. 58-7 at 139). Ron Lundine consulted with Rodger Matthews and Charlene White (Human resources contact, retired) about the situation and decided to issue a letter of counseling. (App. 895; R.Doc. 58-7 at 139). Ron Lundine relied on the word of Tiffany

Buettgenbach when issuing a letter of counseling to Plaintiff on July 11, 2016. (App. 895; R.Doc. 58-7 at 139). Ron Lundine did no investigation into the incidents for which the letter of counseling was issued. (App. 895; R.Doc. 58-7 at 139).

Lundine had never issued a Letter of Counseling to any other employee. (App. 895; R.Doc. 58-7 at 139). Although promised that it would not appear in her official file, this letter of counseling is listed in the ROI as part of her disciplinary record. (App. 759-766; R.Doc. 58-7 at 1-9).

## I.  *Complaints of Discrimination*

Plaintiff made known to her management that she believed she was being singled out and discriminated against. She complained to Tracy Ware about the issues she was having in her position on April 8 and 26, 2016. (App. 823; R.Doc. 58-7 at 67).  On May 2, 2016, Plaintiff complained to Mike Alston after a Town Hall Meeting with the division. Rodger Matthews interrupted the meeting so Plaintiff followed up with an email to finish the discussion. Even though Mr. Rodgers and Mr. Witt could hear what was said, Ms. Parker continued and told Alston that she was in a dead-end job, with no work, and would like to either be detailed or reassigned out of Product Management. (App. 823; R.Doc. 58-7 at 923).

On January 21, 2016, Plaintiff contacted Deborah Davis and explained her concerns to Deborah Davis about discrimination in RMA including that she had no work. ((App. 823; R.Doc. 58-7 at 923).  On July 14, 2016, Plaintiff contacted Derrick Johnson,

the Union President, and discussed with him the discrimination she was experiencing, including issues with the cafeteria, that she had no work, that he had been denied details and other opportunities that would give her more promotion potential and generally about her experiences with discrimination. (App. 816-880; R.Doc. 58-7 at 54-124). Plaintiff also complained to Alvin Gilmore. (App. 824; R.Doc. 58-7 at 68).   No investigation into any of Plaintiff's complaints was conducted. (App. 824; R.Doc. 58-7 at 68).   After John Underwood took over from Rodger Matthews, Plaintiff requested that he investigate her complaints of discrimination. Mr. Underwood's testimony regarding the initiation of an investigation is not credible as he also claims that Ms. Parker rescinded her request for the investigation, which is patently false, as shown by the email of June 28, 2018.(App. 1183 – 1188; R.Doc. 58-11).

Being given no job duties, having significant duties shorn from her, being given menial work, being excluded her from Division meetings, not being acknowledged or spoken to all changed the terms and conditions of Plaintiff's employment. She was in a dead-end, no- promotion potential job with no daily duties, with a boss and second line supervisor who appeared not to want her there and who were placing roadblocks in any path to promotion or transfer, caused Plaintiff significant trauma and changed the terms and conditions of her employment. (App. 828; R.Doc. 58-7 at 72). Other employees saw the toll that this constant harassment took on her. (App. 1086-1089; R.Doc. 58-8).

## J.  *Complaint No. RMA-2018-00965*

On December 5, 2018, Plaintiff filed her formal complaint of discrimination with complaint number RMA-2018-00965.(App. 1259; R.Doc. 58-17).The issues that Plaintiff was having intensified throughout the investigation into her discrimination complaint, 2016-00796. After the parties attended mediation, her supervisor, Ron Lundine became openly hostile to her. From August 8 to September 24, 2018, Lundine scolded her, ignored her during working hours, and accused her of disparaging and threatening other employees. (App. 1253 – 1305; R.Doc. 58-17).

During the workday, Lundine began walking past her work area and he would not look at her or say anything at all to her. It was an intentional snub. He talked to everyone else but would talk to Plaintiff only in his office behind closed doors. (App. 1253 – 1305; R.Doc. 58-17)  Lundine began a pattern of Instant Messaging or emailing Plaintiff right before the close of business to scold or reprimand Plaintiff about things he heard about her. (App. 1253 – 1305; R.Doc. 58-17).

## K. *Papering the File*

Plaintiff was given a letter of reprimand on May 25, 2018 for failing to request leave in advance of departing the work area. Plaintiff explained that she had personal issues going on and forgot to request the leave. (App. 1253 – 1305; R.Doc. 58-17) Plaintiff has a heart condition that is exacerbated by stress. On August 20, 2018, she

requested advance annual leave for time off that was caused by her medical condition.

She explained that she could not afford to take Leave Without Pay. (App.

1047; R.Doc. 58-7 at 291). Plaintiff was denied advance leave. (App. 1253 – 1305;

R.Doc. 58-17)

Underwood issued a Letter of Counseling to Plaintiff, in part, because Plaintiff

used the information that Caucasian new hires were allowed to use advance leave while

Plaintiff was not, in the mediation of her EEO complaint. (App. 1253 – 1305;

R.Doc. 5817) Plaintiff had access to a specific female Caucasian new hire who had used

advance leave at the time Plaintiff was denied. (App. 1253 – 1305; R.Doc. 58-17)

Plaintiff believes, and Underwood's affidavit confirms, that this Letter of Counseling was

direct retaliation for her EEO complaint. (App. 1253 – 1305; R.Doc. 58-17)

In addition to Plaintiff knowing from her position that an employee was receiving

more favorable treatment than she, Underwood and Lundine also put in the letter of

counseling that Plaintiff told a new hire she got her job because she was white. Plaintiff

denies that occurred and the employee testified that Plaintiff implied the employee

improperly received her job but did not say it. (App. 1253 – 1305; R.Doc. 58-17)

### L. Joking Responses to Provocations

Plaintiff had been having difficulty with Charlene Madsen, the other Program

Support Assistant, for several years. She had reported incidents with Ms. Madsen many

times and even had an unsuccessful mediation meeting with her to resolve the issues

between them. (App. 1253 – 1305; R.Doc. 58-17) Charlene Madsen is difficult to get along with and other employees have had issues with her. (App. 1253 – 1305; R.Doc. 5817) For several years, Ms. Madsen engaged in conduct trying to provoke Plaintiff. (App. 1253 – 1305; R.Doc. 58-17) In approximately August 2018, Madsen sent Parker an email that taunted, "Don't bite the hand that feeds you." (App. 1253 – 1305; R.Doc. 58-17). Ms. Parker muttered jokingly "I should kick Charlene's ass" or something like that. It was a joke; Parker did not act on it in any way. (App. 1253 – 1305; R.Doc. 58-17). An employee, Julie McKeague, overheard it and contacted her supervisor, believing the remark to be unprofessional. (App. 1253 – 1305; R.Doc. 58-17) Thereafter, Plaintiff's supervisor, now John Underwood, elevated the comment to a threat of bodily harm directed at Charlene Madsen. He contacted security and he contacted the Federal Protective Service to investigate Plaintiff for threatening to commit physical violence within the Beacon facility. (App. 1253 – 1305; R.Doc. 58-17)

Underwood called HR about Plaintiff's joking comment. HR said they wanted to give Ms.Parker one more chance, so he contacted Federal Protective Service himself about her. (App. 1253 – 1305; R.Doc. 58-17) Underwood testified that if the behavior was confirmed, it might have led to a suspension. If she had committed a crime, then she would have gotten a federal summons. If she had been found guilty, she would have been removed. (App. 1253 – 1305; R.Doc. 58-17)

Plaintiff's badge was then flagged and she had to have Don Butler, Director of EPD, Security, to escort her in the building. (App. 1253 – 1305; R.Doc. 58-17)   On September 4, 2018, Plaintiff learned from Maureen Ferentz that she was the subject of a misconduct investigation. No one contacted her about the investigation. (App. 1253 – 1305; R.Doc. 58-17)  The investigation pushed Plaintiff over the edge; she had too much stress and anxiety. It was not good for her health. (App. 1253 – 1305; R.Doc. 58-17) Darryl Remington Hinden testified that Plaintiff was very stressed and retired to get away from the situation. (App. 1253 – 1305; R.Doc. 58-17)  Thereafter, Plaintiff decided she had to retire to maintain her status and to avoid being terminated. (App. 1253 – 1305; R.Doc. 58-17) She had told Stephanie Cole that she did not have the financial means to retire. Cole believed that retirement was prudent to protect her status because of the investigation. (App. 1253 – 1305; R.Doc. 58-17).

Plaintiff was extremely distressed about the investigation, the letter of reprimand, the counselings, the Friday afternoon discipline, and the ostracization she felt from Lundine. She called Janel Butler and told her that she needed to retire. In that conversation, she made a remark that she needed to retire before she hurt someone. (App. 1253 – 1305; R.Doc. 58-17). Although Plaintiff was never given a copy of the voicemail, Defendant claims that she stated: "Janel, this is Deidre Parker. I have been trying to call you since last week. I need to make an amendment or even file a new complaint. I am, uh, on my way to work today. I am going to retire today 'cause I am tired of going to this

job every day with nothing to do. I am tired of being constantly being reprimanded or counseled for something that I don't do. And I feel like that, uh, you know I am going to hurt somebody cause I can't go to the job. They are constantly making me feel like I am not worthy, so I need to file a complaint before, uh uh, an amendment to my original complaint. And, I am going to see Patty Gepford, cause I am leaving as I can't take USDA anymore." (App. 1253 – 1305; R.Doc. 58-17).

John Underwood perceived the voicemail to be a direct threat of violence against Charlene Madsen. He asked FPS and FRT to investigate this as well. He states that the investigation, at that point, was not heading in a good direction at the point she retired. (App. 1253 – 1305; R.Doc. 58-17) Underwood placed Plaintiff on a watchlist for threatening people in the building. (App. 1253 – 1305; R.Doc. 58-17)   When Plaintiff came to the building to fill out her retirement papers, she was required to have an escort. (App. 1253 – 1305; R.Doc. 58-17).

Rios, a Union Steward, explains that this "trumping up" of charges against an employee is common; it happened to him when he asked questions of Secretary Perdue, then was accused of being a threat. (App. 1086-1089; R.Doc. 58-8) Underwood did not perceive this voicemail as being a complaint of harassment or discrimination and did not investigate it as the only complaint of harassment he began to investigate occurred on June 20, 2018. (App. 1253 – 1305; R.Doc. 58-17). (As noted above, he claims Plaintiff withdrew that complaint; Plaintiff says she did not.)

Don Butler explained that any time a comment that could be taken as violence is made, he is tasked with interviewing the person to determine what they meant by that comment. (App. 1253 – 1305; R.Doc. 58-17). This never happened with regard to Deidre Parker. He was not part of the investigative process and he never interviewed Plaintiff or talked to her. (App. 1253 – 1305; R.Doc. 58-17). Patricia Brooks, who worked with the Union, came to the conclusion that the misconduct investigation was set up to fire Plaintiff. (App. 1253 – 1305; R.Doc. 58-17).

Approximately a week after Complainant was forced to retire, the Agency posted positions that gave two white ladies the opportunity to go to a GS-12 and neither of these ladies has a degree. (App. 1253 – 1305; R.Doc. 58-17). Brooks testified "That is discrimination to me, when you give (in this case white women) an opportunity, but not all. And it was not just the Complainant, like I said, it happened to a retired Hispanic woman, too. The right thing is to promote all of the secretaries; the Agency should have promoted them all equally. When the Agency promoted the white secretaries to a GS- 9, they should have promoted the Complainant to a GS-9 too. Hindrances and lack of opportunities occur when you are not afforded the same opportunity or promoted equally." (App. 1253 – 1305; R.Doc. 58-17). The stress of Plaintiff's job took a toll on her. She was diagnosed with an enlarged and hardened heart causing it to beat fast. It is a heart muscle disorder. (App. 1253 – 1305; R.Doc. 58-17).

Her heart condition was out of control while she worked at RMA. She was under FMLA and with her cardiologist because an episode could happen at any time. (App. 1253 – 1305; R.Doc. 58-17). Brooks observed the headache, heartache, and all the stress Plaintiff endured while working for the Agency. She believes she was forcefully made to retire; she testified she would have left the Agency also. (App. 1253 – 1305; R.Doc. 5817).

## VII. SUMMARY OF THE ARGUMENT

Deidre Parker roamed the halls asking people to give her work after she filed and settled her first EEO complaint because her boss no longer allowed her to work on the higher level projects she had been doing with great success, gave her no work within her grade, offered her only grunt work and below grade assignments, refused to speak to her and banned her from eating at the cafeteria for a period of 90 days after she was falsely accused of theft and other inappropriate behavior. It became clear that the Agency was looking to terminate Ms. Parker or at the least continue a path of humiliation in which she had to beg her supervisors, co-workers and even those outside of her division to put her to work. These actions constitute harassment, discrimination and retaliation. The Court erred in granting summary judgment on her claims.

## VIII. ARGUMENT

### A. Legal Standards

*De novo* review is appropriate in this case as it comes b efore the court following the grant of Summary Judgment pursuant to Defendant's Motion for Summary Judgment. *Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000); *Cherry v. Menard, Inc.,* 101 F.Supp.2d 1160, 1167 (N.D. Iowa 2000); *Hunt v. Cromartie,* 526 U.S. 541 (1999).

Summary judgment should be granted on whee "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(c). The Court is obliged to view the facts in the light most favorable to the

complainant and draw all inferences in his favor. *Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bassett v. City of Minneapolis,* 211 F.3d 1097, 1098 (8th Cir. 2000).

Even when the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues. *Hunt v. Cromartie,* 526 U.S. 541 (1999). Here, Plaintiff has established issues of fact regarding each element of his claims, creating a *prima facie* case. *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir. 1998).

**B. Legal Argument**

**1. *The Court Erred by Improperly Limiting the Scope of Plaintiff's Claims.***

Acts of harassment are not discrete acts for which the limitations period must be closely watched. Defendant would limit Plaintiff's claims to only those actions that took place after she settled her claim for the lowered performance review. That limitation is not appropriate.

The Supreme Court analyzes disparate treatment claims differently from harassment claims. "Discrete acts" such as terminations, disciplinary actions, lowered performance appraisals and the like whose occurrence dates are specific and available are considered separate and discrete discriminatory practices under Title VII. Each of those acts must be raised with an EEO counselor within 45 days of the bad act. *See National*

*Railroad Passenger Corp. v. Morgan,* 536 U.S.101, 114-15 , 122 S. Ct. 2016, 2073 (2002). The court differentiates hostile work environment claims. Those kinds of claims are "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id*. at 117. As long as one act of harassment falls within the time limitation, all of the acts may be evidence that a hostile environment exists. Id.

The lower court limited the hostile environment claim in two ways. First, it would limit the claim to only those specific instances set forth in the complaint alleging hostile work environment despite the complaint itself stating that these incidents were examples only of a hostile environment that took place over a series of years, carried out by her VA supervisors. Second, the defendant would limit her claim to only those actions that occurred after she withdrew her first complaint of discrimination, filed in 2015. Neither limitation is supported by law.

The Eighth Circuit Court of Appeals has held that certain claims not included in the original charge of discrimination are properly before the court where the claims are clearly "like or related to the substance of the EEOC charge." *EEOC v. Delight Wholesale Co*., 973 F.2d 664 (8th Cir. 1992). See also *Patrick v. Henderson*, 255 F.3d 914, 915-916 (8th Cir. 2001). In determining whether an alleged discriminatory act falls within the scope of a discrimination claim, the administrative complaint must be construed liberally in order not to frustrate the remedial purposes of the anti-discrimination statutes. A plaintiff may seek relief for any discrimination that grows out of or is like or reasonably

related to the substance of the allegations in the administrative charge. *Weems v. Federated Mut. Ins. Co.*, 220 F.Supp.2d 979 (N.D. Ia. 2002).

The sweep of any subsequent judicial complaint may be as broad as the scope of the investigation. *Id*. Put another way, the jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation. *Sosa v.Hiroaka,* 920 F.2d 1451, 1456 (9th Cir. 1990). Subject matter jurisdiction extends over all allegations of discrimination that either fell within the scope of the actual investigation or an investigation "which can reasonably be expected to grow out of the charge of discrimination." *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1099 (9th Cir. 2002.). Thus, when an employee seeks judicial relief for incidents not listed in his original charge, the judicial complaint may nonetheless include any discrimination like or reasonably related to the allegations of the charge. *See Weems v. Federated Mut. Ins. Co.*, 220 F.Supp.2d 979 (N.D. Ia. 2002). This is logically congruent with the remedial purpose of the statute. Any other outcome would be illogical as the statutes require an investigation. If the complaints on the face of the Charge of Discrimination limited harassment to just those complaints, there would be no reason for discovery or witness statements, investigation or affidavits.

In this matter, Plaintiff settled her EEO claim regarding Rodger Matthews unilateral changing of Plaintiff's performance review from Outstanding to Fully Successful. The settlement agreement provides that Plaintiff has waived all claims that

arose prior to the execution of the settlement agreement. Plaintiff has relied upon the facts of those claims not as claims for which she can now seek remedy but as evidence of the continuing violation of the defendant. *Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802 (Del. D.C. Nov. 12, 1986).

Defendant would have the Court ignore all acts that occurred prior to May 29, of 2015 on the basis that those acts have not been administratively exhausted because Plaintiff withdrew her initial charge of discrimination. The law does not require such blindness. The discrete acts that occurred in 2015 are admissible for other purposes and the Court should review them as evidence supporting plaintiff's claim. "The existence of past acts and the employer's prior knowledge of their occurrence does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. An employee may also use the prior acts as background evidence to support a timely claim." *AMTRAK v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). The Court is not barred from considering the settled allegations for other purposes than claims for damage.

### 2. *The Court Erred in Granting Summary Judgment on Plaintiff's Claims of Discrimination*

Plaintiff Has Established Sufficient Facts Regarding Race and Sex Discrimination for the Matter to Proceed to Trial.  Employment discrimination cases are evaluated under

the framework of the McDonnell- Douglas burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802– 804, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (19983). The first step in the analysis places the burden of production on the plaintiff to establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties of the job; (3) she suffered an employment action; and (4)the adverse employment action occurred under circumstances that give rise to an inference of discrimination on the basis of membership in the protected class. *Id.*

Where a plaintiff alleges a failure to promote, the elements change slightly. The elements for a failure to promote claim include showing that: (1) the employee was a member of a protected group; 2). She was qualified and applied for a promotion to a position for which the employer was seeking applicants; 3) she was not promoted and (4) similarly situated employees, not part of the protected group, were promoted instead. A*ustin v. Minnesota Min. & Mfg. Co.,* 193 F.3d 992, 995 (8ᵗʰ Cir. 1999). Once Plaintiff establishes a prima facie case, the burden of persuasion shifts to the Defendant to establish a non-discriminatory reason for the failure to promote. *Dixon v. Pulaski Cty. Special Sch. Dist.*, 578 F.3d 862, 868 (8ᵗʰ Cir. 2009). If the Defendant articulates a legitimate, nondiscriminatory reason, the burden shifts back to plaintiff to establish that the reason given for the failure to promote is pretextual. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8ᵗʰ Cir. 2006). Plaintiff, a black woman over the age of forty with a

documented disability, is a member of a protected class. Her Outstanding and Fully Successful reviews establish that she was qualified for the position and making the Best Qualified list for each of the positions for which she applied also establishes that she was highly qualified. Defendant argues that she did not suffer any adverse job actions.

Plaintiff alleges both discrete events as adverse job actions and the aggregation of discriminatory practices that altered the terms of and conditions of her employment.

During her tenure as a Program Management assistant, the work in the area began to diminish. As a result, the white employees who had the same job title and position but had less experience and education, were offered detail assignments, promotions and transfers. All of the other program management assistants were Caucasian and had no college degree. Plaintiff, a black female, has a college degree.

Plaintiff continuously requested special assignments, job shadowing, to be detailed into different positions, to be reassigned. She applied for promotions and requested to be moved out of the Product Management Division to a division that could provide her with consistent work. These requests were largely ignored while the same opportunities have been given to all her Caucasian co-workers.

Complainant remained a Program Management Assistant with the lowest grade (GS-7) and pay in RMA with a college degree. Even when the divisions to which Plaintiff sought the detail agreed to it, Plaintiff was denied those opportunities. Plaintiff was relegated to walking around the agency asking branch chiefs and others if there was any

work she could perform. Beginning in approximately 2016, Plaintiff had no specific job duties or daily work assignments.

Plaintiff apprised her supervisors and second line supervisors of her lack of work and daily assignments, but they provided no remedy for her complaints.

Plaintiff applied for multiple positions as detailed in the statements of fact. She was never promoted even though she met the Best Qualified list on at least four occasions. Her white counterparts, however, were all promoted. One, Charlene Madsen, was given "front office" duties and when Debbie Lackey got promoted to a new position, Charlene took over Debbie's duties. She remained as the acting Management Analyst for approximately four years, then was officially promoted into the position she had performed for five years in 2018. (Ex. 17, Madsen Affidavit 2nd ROI 00150-00151).

In approximately August 2015, the position in which she had been acting since approximately 2013 was posted for applications to a permanent GS9 position. Madsen applied for position and received it. Thereafter, in 2018, she was again promoted to a GS11 Management Analyst, doing the same job. (Ex.17, Madsen Affidavit, 2nd ROI 00150-00151). In 2015, Ms. Parker knew the position was being announced. However, she did not apply for it as it had clearly been earmarked for Charlene Madsen. She knew that the Agency would not replace

Charlene as she had been given the opportunity to act in the position for years. (Ex.

17, Madsen Affidavit, 2nd ROI 00150-00151; Plaintiff's Statements of Fact (PSOF) 85-90. Applying for this position would have been futile. *Williams v. Waste Mgmt.*, 411 Fed.Appx. 226 (11th Cir. 2011).

Generally, a failure to promote claim requires an application for the position and then not being chosen. However, the Supreme Court recognizes that sometimes, an application is futile because of discriminatory practices. "The Supreme Court has characterized the types of discriminatory practices that render an application futile; they are "the most entrenched forms of discrimination" that will "deter job applications from members of minority groups," *Int'l Bhd of Teamsters v. United States,* 431 U.S 324, 367, 97 S.ct. 1843, 52 L.Ed.2d 396 (1977). A plaintiff must show that she had a justifiable believe that discriminatory hiring practices made application futile. In this case, Deidre Parker, through her testimony and that of others, has established that African Americans are promoted less often than their white counterparts. In this particular instance, she has shown that Charlene Madsen was given the assignments that would allow her to be promoted to the position opened in 2015 while Plaintiff was denied those assignments. She has also shown that Charlene Madsen was allowed to actually work the position that was announced for years before the announcement. In this circumstance, Deidre's application would have been futile under the law. Of note, Ms. Madsen was promoted to a GS9 in 2015 and a GS11 in 2018 while Plaintiff remained a GS7.

The failures to promote, to train, to detail, to reassign were all discrete acts of discrimination, as were the disciplinary acts including the verbal counselings, the written counselings, the written reprimand and the trumped up investigation. Even the banning from the cafeteria was a discrete act of discrimination by the Agency. The Agency enforced the ban and gave Plaintiff a written reprimand over it. Plaintiff has laid out in detail the discrete acts of discrimination in her statements of fact. The Agency's refusal to give Plaintiff special assignments or even to work the front office had specific and tangible negative impact on

Plaintiff's career, as in the RMA, being given high profile assignments was essential to promotion. See Ex. 8, Rios Declaration.

Failure to Train Coupled with the Shearing of Duties Constitutes an Adverse Personnel Action  A court must look at the totality of the facts when determining whether a plaintiff has stated a claim for discrimination. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) explains that adverse job actions fall within three categories: (1) termination or reduction in financial terms of employment; (2) transfers or changes in job duties that cause skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions such as hostile work environment or conditions amounting to a constructive discharge. Id. at 453–54. Taking away significant job duties is an adverse job action. Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997). Plaintiff, even in the briefing, is reduced to a low level employee capable only of scanning and clearing files

while her position description outlines the duties of a trusted professional. Nearly all duties were taken from her save one sentence in the five page position descriptions.

Defendant parses out each particularized job action and exclaims that the specific action standing alone is not an adverse job action. One cannot place blinders on and ignore the environment within which Ms. Parker worked. The workplace was riddled with unbearable racial and misogynistic animus. People with brown skin were not promoted, were treated as if they were thieves, and the African-American employees were treated with disdain and dismissively on an ongoing, everyday basis. The African-American employees watched as people of color were treated differently from the Caucasians in the work group. Even without all of the other harassing behaviors—such as undercutting her, refusing to speak to her, failing to have her involved in meetings that would give her information about her duties, and downplaying her hard earned Bachelor's degree, refusing training, details, job shadowing, even work in the front office -- Plaintiff has established that the failure to train her f riddled the work environment with unbearable alterations, creating a hostile work environment. This hostile work environment constitutes an adverse job action for which the agency is accountable.

What is missing from defendant's analysis is Plaintiff's testimony that the actions were pervasive, intense, occurred daily; the nitpicking has been corroborated with thousands of pages of emails and other documents that were generated over a brief period of time; the derogatory comments occurred regularly and there is a paper trail on at least

one of them; Lundine and Rodgers quit giving her work and stopped inviting her to the meetings involving her duties as soon as she settled her first EEO complaint. The actions of Lundine, Matthews and Underwood substantially altered the working conditions and duties of Plaintiff, creating an unbearable and insuperable bar to accomplishing her assigned duties—the hallmark of an "adverse job action."

### 3. Plaintiff Established Adverse Job Actions That Support her Claims

Plaintiff suffered an adverse action when Plaintiff was disciplined unfairly, was treated less favorably than similarly situated Caucasian employees, and undermined to both her supervisees and to upper management. Plaintiff was singled out for harassment and humiliation. She was given no work of any kind and certainly not the high-profile offerings given to her white counterparts that allowed them to be promoted. She was given verbal and written reprimands that were unjustified and unjustifiable. Even the "fully successful" performance review she received in 2013 constitutes an adverse job action where other less qualified individuals were given higher evaluations, promotions, and supervisory details and/or positions. These alterations in her employment constitute adverse action. See *Kim v. NashFinch Co*., 123 F.3d 1046 (8th Cir. 1997); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998) (10th Cir. liberally defines phrase adverse employment action; takes case by case approach).

Plaintiff was singled out and treated in demeaning ways including having her work scorned to upper management; upper management – particularly John Underwood called Plaintiff a thief and untrustworthy without investigation or even knowing her. Plaintiff was consistently harassed. She was ignored by her supervisor, never given job duties, treated unprofessionally and in a dismissive manner. She was passed over for advancement opportunities. All of these actions constituted adverse job actions. *Ellis v. Houston*, 742 F.3d 307, 326 (8th Cir. 2014); *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 412 (6th Cir. 1999). Adverse actions may be less severe than outright discharge. Kim v. NashFinch Co., 123 F.3d 1046 (8th Cir. 1997).

The Tenth Circuit is in accord. *See Belgasem v. Water Pik Techs., Inc.,* 457 F.Supp.2d 1205 (Co. D.C. 2006). While the Tenth Circuit has not ruled directly on whether denial of training is an adverse job action, the Tenth Circuit "liberally defines" an adverse job action. *Sanchez v. Denver Public Schools,* 164 F.3d 527, 532 (10th Cir. 1998). Adverse actions are not limited to monetary losses in the form of wages or benefits. Rather, a court must take a "case by case approach, analyzing the unique factors in each situation. Id. One factor in determining an adverse action is whether the action "causes harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004). An adverse job action must cause more than de minimis harm to an employee's job opportunities or status. Id. Types of actions that have been found to be "adverse job actions" include a negative job reference, *Berry v. Stevinson Chevrolet*, 74

F.3d 980, 986–87 (10th Cir. 1996); forced transfer with the admonition to speak to no one, *Duda v. Bd. Of Educ. Of Franklin Park*, 133 F.3d 1054, 1059 (7th Cir. 1998) (cited in *EEOC v. C.R.Eng., Inc.*, 2011 U.S.App. LEXIS 8971 (10th Cir. 2011); a failure to train that plays a role in increasing job duties can be an adverse job action if that materially affects his position (see *Barnes v. Cessna Aircraft Co.*, 2011 U.S. Dist. LEXIS 147780 (Ks. D.C. 2011) (claim failed because plaintiff did not show that denial of training increased job duties or materially affected position).

Plaintiff has established that her supervisors failed to train her; demeaned her publicly in front of the higher management; took away her job duties after she filed an EEO complaint; supported a highly humiliating ban from the cafeteria; engendered rumors that she could not be trusted which would torpedo any employee's advancement; gave her verbal and written counselings and reprimands without investigating them; initiated an FPS investigation even though HR suggested otherwise; refused to speak to her except to give her negative feedback or discipline on a Friday to ruin her weekend and many, many other events as set forth in the statement of facts. Plaintiff was constructively discharged as a result. A constructive discharge or forced transfer is also an adverse job action. Following the departure of Plaintiff three other Caucasian females were promoted to positions for which she had qualified. As discussed above, the constructive discharge/forced transfer is also an adverse job action.

### 4. *Defendants' Actions were Pretextual*

All of these claims are race, sex and / or based on retaliation for prior complaints. Plaintiff received outstanding performance appraisals from Sydnee Chattin, her first supervisor. Rodger Matthews, on his own, reduced her appraisal from outstanding to fully successful. Matthews is known to favor men and white females in his selections. He has also relied on the stereotype that black females are angry. He is part of a group of "good old boys."

Plaintiff filed her first EEO complaint to have that Outstanding reinstated as she wanted to do well, to be promoted, to have a career at USDA. She was a single mom who worked herself through her bachelor's degree while simultaneously working. Sydnee Chattin left the division in July 2015, was replaced by Ron Lundine in August 2015 and she settled her EEO case in August 2015. From August on, Plaintiff was ostracized by her supervisor; the invitations to division chief meetings that outlined her job priorities ended; she was given fewer jobs until by 2016, there were no duties for her. The timing alone establishes that the defendant's rationales for all of their decisions were pretextual.

The Beacon Café incident clearly shows the behind the scenes discriminatory acts that kept plaintiff from advancing. First, John Underwood – who later became division chief – told others that she was a thief and could not be trusted. He, Rodger Matthews and Ron Lundine coordinated disciplinary action against her. They tried to get an FPS

investigation started, but FPS declined. Even then, these men were trying to get Deidre Parker papered so she could be fired. At the time of the Beacon Café incidents, they already knew that Tiffany Buettgenbach was trying to retaliate against USDA employees who made complaints against her. Deidre just happened to be the one who complained when Calvin Moses smashed her sandwich, was nasty to her and refused from then on to serve her. Underwood, Matthews and Lundine used this incident to undercut Plaintiff and begin the whisper campaign that eventually drove her from federal service.

When Plaintiff did make an ill-advised joke about Charlene Madsen, instead of counseling her as HR suggested, Underwood took it upon himself to elevate the matter to a full FPS investigation. While Underwood proclaims that he had no control over the FPS investigation, the evidence shows otherwise. It shows that he was the one that requested the investigation to occur. It also shows that the normal protocol of having Don Butler initiate the investigation to determine whether there was a problem was bypassed and the Federal Protective Service brought in immediately. As a result, Deidre Parker never got to explain that her comment was a joke. She also never got to explain that the "hurt someone" comment was directed toward herself.

### 3. The Court Erred in Granting Summary Judgment on Plaintiff's clams of harassment and retaliatory harassment

Sex discrimination that creates a hostile or abusive work environment is a violation of Title VII of the Civil Rights Act of 1964. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S.

57, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986). A hostile work environment arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's wor performance or creating an intimidating, hostile or offensive working environment. *Id*. To prevail on a sexual harassment claim, a plaintiff must show that 1). She belongs to a protected group 2). She was subject to unwelcome sexual harassment; 3). The harassment was based on sex; 4). The harassment affected a term or condition or privilege of employment and 5) the employer knew or should have known of the harassment and failed to take proper remedial action. *Moylan v.MariesCounty,*7 92 F.2d 746, 749 (8th Cir. 1985). Race harassment has the same elements.

When systemic or longstanding discrimination is continuing to occur within the limitations period, the acts are part of a continuing violation. See *Banks v. McIntosh Cty.*, 2022 U.S.Dist. Lexis 23466, 2022 WL 400810 (GA S.D. 2022). Continuing acts of discrimination are related instances of discrimination that are permitted by the defendant to continue unremedied for so long as to create a policy or practice. "The doctrine applies to claims composed of a series of separate acts that collectively constitute one unlawful employment practice." *Washington v. Cnty. Of Rockland*, 373 F.3d 310, 318 (2nd Cir. 2004)(quoting *Nat'l R.R. Passsenger Corp. v. Morgan*, 536 U.S. 101, 111, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)); *Walker v. City & Cty of Denver*, 2019 U.S.Dist. LEXIS 47035 (CO., Mar. 21, 2019).

**4. The Court erred in Granting Summary Judgment on Ms. Parker's Retaliation Constructive Discharge Claims.**

To establish a prima facie case of retaliation under Title VII, a plaintiff must show 1) he or she engaged in protected activity; 2) the defendant took adverse employment actions against her; 3) the adverse employment action was causally related to the complaint. *Smith v. St. Louis University,* 109 F.3d 1261, 1266 (8th Cir. 1997). Once a plaintiff makes the prima facie showing, the burden of production shifts to the defendant to articulate a legitimate non0discriminatory reason for its actions. *Jackson v. Delta Special Sch. Dist.,* 86 F.3d 1261, 1266 (8th Cir. 1996).

The same principle applies where employment action has been taken that is less severe than termination. *Kim v. Nash Finch,* 123 F.3d 1046, 1060 (N.D. Iowa 1997). In *Kim,* the plainitff had not been discharged but after engaging in protected activity, his duties had been reduced, he received a lowered performance rating, was required to undergo remedial training and his file had been "papered" with negative reports.

Ms. Parker experienced these same issues. She was successful in her EEO complaint in May 2015 and by approximately June she no longer had duties and was being offered work below her grade level, education level and expertise. She was taken off of staffing meetings and not allowed to attend division meetings. She had to roam the

halls looking for things to fill her day. These, plus the demeaning manner in which her supervisors treated her after her EEO complaint all meet the elements of retaliation.

Constructive discharge was the final result of the retaliation and harassment that she experienced. Constructive discharge is an adverse job action. *Thompson v. Bi-State Dev. Agency,* 463 F.3d 821, 825 (8th Cir. 2006). To prove a constructive discharge, a plaintiff must show 1) that a reasonable person in his position would find the working conditions i ntolerable, and 2) the employer intended to force him to quit. *Carpenter v. Con-Way Cent. Express, Inc.,* 481 F.3d 611, 615 (8th Cir. 2007).

A court must view the totality of the circumstances to determine whether the harassment was pervasive and severe enough to alter the terms and conditions of employment. Plaintiff has established those facts. In this instance, Plaintiff has made a submissible case of both racial and sex discrimination. The working environment at the USDA / RMA was very male dominated and oppressive to women. There was a "good old boys" network and the vibe at RMA was very male dominated. These men also made it clear they believed black women to be challenging, bold, but also lazy, making elevation to higher positions very difficult for them. These actions and attitudes created a hostile working environment. Not only did the men treat the females, especially black females as less than men, they engaged in specific acts of harassment that created a hostile working environment. Those included, without limitation, being singled out for discipline. Plaintiff was disciplined unfairly, unfairly scrutinized, was treated less

favorably than similarly situated Caucasian employees, and undermined to both her colleagues and to upper management. Plaintiff was singled out for harassment and humiliation. She was set up for failure in that position.

The forced retirement of Plaintiff was the raison d'etre for the harassment – the natural and foreseeable result of the actions of the Defendants. From the Beacon Café incident forward, it was clear that the men who were her upper managers wanted her out and took every possible action to make it happen.

Plaintiff's position and her ability to have upward mobility was destroyed by their acts in refusing her work, details, training, special projects or any kind of duty that was part of her position description. Offering to detail her to the warehouse in FSA (a GS6 position) while at the very same time refusing details to HRD and job shadowing for a Contract Specialist establishes their motive to force plaintiff out.

The elevation of a joke to a Federal Protective Service investigation caused Plaintiff to leave Federal service. Forced retirement does create constructive discharge. *Green v. Brennan*, 2017 U.S. Dist. LEXIS 148295 (D. Co. Sept. 13, 2017). Plaintiff has established a submissible claim for constructive discharge.

The Court erred in granting summary judgment on this count.

## IX. CONCLUSION

For the reasons set forth above, the lower court's grant of summary judgment on behalf of the defendants should be reversed and the case remanded to the lower court for trial.

Respectfully submitted,

*/s/Rebecca M. Randles #40149*
Randles Mata, LLC.
851 NW 45th Street, Suite 310
Kansas City, MO. 64116
(816) 931-9901 (816) 931-0134 FAX
rebecca@randlesmatalaw.com

Attorneys for Appellant

# X. CERTIFICATE OF COMPLIANCE

Comes now plaintiff appellant and hereby states that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportional spaced type using Word 10 in 14 – point New Times Roman and contains 12858 words.

# XII. CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Rebecca M. Randles* Attorney
for Appellant